## Wytheville.

TATE ET AL. V. TATE'S EXECUTOR ET ALS.

August 4.

## Absent, *Moncure,* P.

1. L H T and his brothers J B T and T M T held real and personal property in common, and also owed joint and individual debts. An agreement was made by L H T of the one part, and J B T and T M T of the other part, whereby, for considerations therein mentioned, the said J B T and T M T bound themselves " to pay all the debts due from the said L H T, J B T and T M T, together with any sum that may be in arrear towards the purchase money of the Poston place, or may be recovered against them by the widow and heirs of H. D. Poston, so as to leave the said L H T free from debt and litigation." HELD : In the interpretation of written contracts, every part of the writing must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other ; and when all other rules of construction fail, the words of the covenant must be construed most strongly against the covenantor. Here the covenant in substance is to make such payment as will leave L H T "free from debt and litigation "; and it is impossible to give effect to this language without construing the words as referring to all the debts of L H T, both individual and partnership.

2. In a contest between the estates of L H T on the one side, and of J B T and T M T on the other, all of said persons being dead, M B T is not a competent witness to prove a claim in his own right against the estate of L H T, when the subject matter of the controversy involves directly transactions to which J B T and L H T were parties, and as to which they alone would be qualified to speak understandingly, and where, as in this case, the estates of J B T and T M T would be liable for the debt so attempted to be proved against the estate of L H T, and the objection of incompetency may be taken by the representation of either J B T or T M T.

3. L H T's personal representatives having improperly abandoned their defence and confessed judgment in an action at law in favor of M B T, the estates of J B T and T M T cannot be held responsible for counsel fees in said action ; for if the parties were justified in confessing judgment, they ought never to have employed counsel to defend them.

4. It is well settled that where an entry is offered in evidence upon the ground that it is against the interest of the declarant, it must be of a pecuniary or proprietary nature. The declaration in such cases derives its value exclusively from the fact that the person has made an entry or charge which it is against his interest to make, and the effect of which will be to render him pecuniarily liable to some third person.

5. The rule of law which protects professional communications is for the benefit of the client, and there is no doubt he may waive it; but the waiver must be distinct and unequivocal.

In February, 1872, Mary C. Tate, in her own right and as administratrix of L. H. Tate, deceased, and Andrew H. Tate in his own right and as administrator of said decedent, along with other parties, filed their bill in the circuit court of Smyth county, in which they alleged that a short time before the death of said L. H. Tate he and his brothers John B. Tate and Thomas M. Tate, then holding in common a large amount of real and personal property, entered into an agreemnt by which the said L. H. Tate and Mary C. Tate, his wife, released to the said J. B. and T. M. Tate all their interest in several tracts of land and in all debts due to the three brothers, except the Richardson debt, together with all claims on the personal property on said lands, etc.; and in consideration thereof, the said J. B. Tate and T. M. Tate released to the said L. H. Tate all their interest in the tract of land on which the latter resided, etc., and bound themselves "to pay all the debts due from the said Leonidas H. Tate, John B. Tate and Thomas M. Tate, together with any sum that may be in arrear towards the purchase money of the Poston place, or may be recovered against them by the widow and heirs of H. D. Poston, so as to leave the said Leonidas H. Tate free from debt and litigation." The bill further alleged that the said J. B. Tate and T. M. Tate had not kept their agreement in this, that they had not paid the debts due from said L. H. Tate, but had permitted his personal representatives to be sued for large amounts and to be put to the expense and trouble of defending suits;

and had suffered a decree to be entered to rent out the land of said L. H. Tate ; that besides this, the said representatives had been obliged to pay various sums of money, and that there were debts outstanding, all of which ought to have been paid by the said J. B. Tate and T. M. Tate, under their said agreement. The bill prayed, among other things, that T. M. Tate, in his own right and as administrator of J. B. Tate, deceased, and the heirs of J. B. Tate, should be made parties defendant to the suit ; that the administrator state what assets of his decedent were in his hands after payment of his debts ; that the plaintiff be paid the amount applied by them to the payment of L. H. Tate's debts ; that his estate be saved harmless in pursuance of the said agreement; that accounts be directed, and general relief. At a later stage of the cause the death of T. M. Tate was suggested and the suit was revived against C. J. Shannon, his executor, and R. S. Bonham, sheriff, and as such administrator *de bonis non* of the said J. B. Tate. The new parties then filed their joint and several answer, in which it was contended that by said agreement J. B. Tate and T. M. Tate only bound themselves to pay the joint or partnership debts of the three brothers, and not their individual debts. It was admitted that at the time the suit was instituted four actions at law were pending against the personal representatives of L. H. Tate in favor of M. B. Tate—viz : an action in the name of C. C. Tate, on a bond of L. H. Tate, for $1,204.48 ; another on a bond of his for $113 ; another in the name of M. B. Tate, on an account for $6,228.57, subject to certain credits; and another on a draft or order drawn by L. H. Tate for $1,000. The personal representatives of L. H. Tate had retained counsel to defend these actions, who filed appropriate pleas, and among others a plea of payment supported by a receipt for $1,678.28 and set-offs, to a considerable amount, The answer claimed that the defence in these actions had been either foolishly or fraudulently neg-

lected and finally abandoned; and that A. H. Tate, administrator as aforesaid, without the knowledge or consent of the respondents, and against the advice of his own counsel, entered into an agreement with M. B. Tate, that judgment might be entered in said actions for about $4,126.78, subject to a trifling credit, whereby it was insisted the said A. H. Tate had ignored the settlement made by his father, rejected his own offsets, released M. B. Tate from the consequences of his willful or negligent failure to collect the order on C. C. Tate until he had become insolvent, and then admitted an indebtedness on that account of more than double the amount of the order.

On the 8th of April, 1880, the commissioner, to whom the cause was referred, made his report, and having stated, among other things, that the debts outstanding against L. H. Tate's estate amounted, principal and interest, to $14,800.57, submitted to the court the question whether or not and to what extent the estates of J. B. and T. M. Tate were liable for the same, and allowed a counsel fee to the attorneys of L. H. Tate's representatives for services in the actions at law aforesaid. Among the witnesses examined before the commissioner was M. B. Tate, and there was also produced a writing signed by G. W. Henderlite, purporting to be a list of bonds due M. B. Tate and including two bonds of L. H. Tate, one for $113 and another for $1,204.48 to C. C. Tate.

James H. Gilmore, who had been counsel for L. H. Tate's representatives in the said actions at law, in his examination before the commissioner was asked the following question: "In the examination of A. H. Tate, defendants, by their counsel, asked the witness if Mr. Gilmore did not advise him to let the causes be tried in court; that the representatives of the estates of Thomas M. and John B. Tate would not be bound by or submit to a settlement to which they were not parties." To which the witness answered,

"I don't remember that he did. He advised me to let counsel settle the matter. He said I had a right to do so, if I wished, myself. I can't say as to the latter clause of the question." "Please say what passed between you and A. H. Tate in this conversation alluded to in the answer? Did you advise him against withdrawing said suits and settling them himself with M. B. Tate out of court?" Answer: "I am willing, so far as I am concerned, to answer this question; but, under the law, I do not think I am permitted to answer the question unless my client consents to it." A. H. Tate's counsel objected, and the question thus raised was by consent of parties referred to the court. There were other proceedings and other parties in the suit, but they are not necessary to be stated.

The cause came on to be further heard on the 23d of September, 1880, on the papers formerly read, and on the report of the commissioner, and the exceptions thereto, among which latter were the following—viz: first, an exception denying the liability of the estates of J. B. and T. M. Tate for the individual debts of L. H. Tate; second, an exception to the allowance of an attorney's fee to the counsel of L. H. Tate's representatives for services in the said actions at law; third, an exception to the allowance of a claim for $3,000 in favor of M. B. Tate, because it was the individual debt of L. H. Tate, and, among other reasons, because the estates of J. B. and T. M. Tate were not bound by the admissions and agreements of L. H. Tate's personal representatives, especially when made without their knowledge or consent. These were substantially all the exceptions to the said report, although there were certain details not necessary to be mentioned.

The court overruled the first exception, but sustained the second, and also the third, so far as it was an objection to the binding effect of the agreement between M. B. Tate and L. H. Tate's personal representatives upon the estates of J.

B. and T. M. Tate, and also in so far as it insisted on the incompetency of M. B. Tate as a witness. The court furthermore decided that Mr. Gilmore was not compellable to answer the question stated above, and that the paper signed by G. W. Henderlite was not admissible in evidence.

A decree was entered in accordance with these rulings, and thereupon an appeal and *supersedeas* were awarded by a judge of this court on the petition of L. H. Tate's personal representatives. The opinion of Judge *Staples* sets forth whatever additional facts are requisite to a full statement of the case.

*J. H. Gilmore* and *J. P. Sheffcy*, for the appellants.

*J. A. Campbell* and *D. S. Peirce*, for the appellees.

STAPLES, J., delivered the opinion of the court.

We are of opinion that, according to the true intent and meaning of the contract of the 24th of October, 1865, John B. Tate and Thomas M. Tate are bound as well for the separate as for the co-partnership debts of Leonidas H. Tate. The stipulation is, "that John B. Tate and Thomas M. Tate shall pay the debts due from the said Leonidas H. Tate, John B. Tate and Thomas M. Tate, together with any sum that may be in arrear towards the purchase money of the Poston place, or that may be recovered against them by the widow and heirs of H. D. Poston, so as to leave said Leonidas H. Tate free from all debt and litigation."

In the interpretation of written contracts, every part of the writing must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other. And where all other rules of construction fail, the words of the covenant must be construed most strongly against the covenantor. Here the covenant in substance is

to make such payment as will leave Leonidas H. Tate
·"free from debt and litigation."

It is impossible to give effect to this language without
·construing the words as referring to all the debts of Leon-
idas H. Tate, both individual and partnership.

This construction is fully confirmed by the evidence of
the Hon. John W. Johnston, who proves that this was the
express understanding and agreement of the parties.   Some
·of the judges are of opinion that this evidence is admissi-
ble, upon the ground that there is some ambiguity on the
face of the instrument proper to be explained by the testi-
mony of witnesses.   All of us concur in holding that the
circuit court properly interpreted the contract as embracing
all the debts of Leonidas H. Tate.

The next question is, whether M. B. Tate is a competent
witness in this case ?   Properly to decide this question we
must first ascertain his interest in this controversy.

In the first place, he is asserting claims against the estate
·of Leonidas H. Tate to a large amount.   1st. An account
amounting to four thousand three hundred and seventy-one
dollars, fifty-seven cents ($4,371.57); 2d. The scaled value of
an order or draft for one thousand dollars ($1,000), drawn
by L. H. Tate in his lifetime upon C. C. Tate, which was
protested and not paid; 3d. The note or bonds executed by
L. H. Tate to Charles C. Tate—one for $1,204.48, due in
1861, the other for $113, due February, 1862—of which M.
.B. Tate claims to be assignee or transferee.   In addition to
these demands he claims to be the owner of a note for
$3,000 (three thousand dollars), executed by Leonidas H.
Tate to B. F. Aker.

On the other hand, the representatives of L. H. Tate have
an account of set-offs amounting to $8,761.90, accruing in
the lifetime of their intestate, and they also rely upon a
receipt for $1,678.30, dated 29th June, 1863, given by M. B.
Tate to Leonidas H. Tate, purporting to be a settlement of

Tate et al. v. Tate's Executor et als.

all demands of the former against the latter down to that date. Their contention is that at the time this receipt was executed M. B. Tate was the owner of the two notes or bonds executed to C. C. Tate by L. H. Tate, and that the receipt proves a satisfaction of these notes, as well as of the other demands of John B. Tate against L. W. Tate.

It is obvious, therefore, that the subject matter of controversy involves directly transactions to which John B. Tate and L. H. Tate were parties, and with reference to which they alone are qualified to speak understandingly.

If M. B. Tate is a competent witness, he is competent to prove his own account and to disprove that of L. H. Tate, and to do away with the effect of the receipt as evidence of a settlement, whilst L. H. Tate is dead and cannot be heard. A very cursory examination of the depositions of M. B. Tate will show that throughout he is testifying with respect to transactions between L. H. Tate and himself, and if the former were alive he might, and no doubt would, give an entirely different version of the state of the accounts between them. Thus far, what has been said is without reference to the alleged settlement between the administrators of L. H. Tate and M. B. Tate. That settlement was made without notice to the personal representatives of John B. and Thomas M. Tate, and without their consent or knowledge. The abandonment by these administrators of their defence to the four actions of M. B. Tate and their confession of judgment therein, constituted under the circumstances a gross dereliction of duty. These judgments are not evidence either against the heirs of L. H. Tate or the representatives of John B. and Thomas M. Tate. The case is before us precisely as it would have been if no such confession of judgment had taken place or settlement had been made, and John B. Tate is equally incompetent to testify now as he would have been on the trial of the action at law.

In either court it would have been the duty of the administrator of L. H. Tate to object to M. B. Tate as a witness. If they fail to do so, whether through ignorance, inadvertence, collusion or *fraud*, it is the privilege of any other person interested in the estate to make the objection. It is competent for an heir or executor to do so.

It is competent for the representatives of John B. and Thomas M. Tate to interpose the objection; for their estates, as has been seen, are primarily bound for the debts of L. H. Tate. Their representatives are the real parties to the controversy, and as such they have the right to control the proceedings, to make defence, to advance testimony, to cross-examine witnesses, and to take appeals.

For these reasons we are of opinion that M. B. Tate is an incompetent witness, and if the appellants failed to object to him as such, it was the duty and the privilege of the appellees to make the objection.

The next question is, whether the estates of John B. and Thomas M. Tate are liable for the fees paid to counsel by the appellants as administrators of L. H. Tate. With respect to those paid or contracted to be paid to counsel to defend the four suits of M. B. Tate, it is very clear that no liability attaches.

If the appellants were justified in confessing judgment in these suits, as is now claimed, they ought never to have employed counsel to defend them. Having improperly abandoned that defence, without the knowledge or consent of appellees, they cannot hold the latter responsible for fees or costs incurred in making a defence so improperly abandoned. Curious enough, the appellants are here insisting upon the validity of the judgments confessed by them, and at the same time they are seeking to hold the appellees liable for fees paid counsel to defend the suits in which the judgments were confessed.

We are of opinion that the claim cannot be sustained.

Tate et al. v. Tate's Executor et als.

With respect to the other fees paid to counsel, we think that the circuit court has very correctly laid down the rule for the guidance of the commissioner, and that is "that no allowance is to be made the administrators for such fees, unless it be shown by proper evidence that they were incurred or rendered at the instance of John B. Tate, or T. M. Tate, or their representatives, and with their approval, or that they were incurred and rendered under such circumstances as to render the said Tates or their representatives responsible therefor."

The next question is, whether the memorandum of George W. Henderlite, containing a list of bonds with their several dates and amounts due M. B. Tate, is proper evidence in this case. This memorandum bears date 7th of July, 1863. It states that these bonds are deposited on that day in Thurman and Henderlite's safe, at Marion, Virginia. It is not signed by any one, although it is conceded to be in the handwriting of George W. Henderlite. At the foot of the memorandum is a certificate of Henderlite himself, made eleven years afterwards on the 25th of September, 1874, in which it is stated that he had given John B. Tate the memorandum in question.

The object in offering this memorandum was to show that at its date M. B. Tate had in his possession the two bonds executed by L. H. Tate to C. C. Tate, and had deposited them with Thurman and Henderlite for safe keeping. One of the curious features of this case is that this memorandum was offered by M. B. Tate to destroy the effect of the receipt given by him on the ——— day of June, 1863, and thus to fix upon the estate of Leonidas H. Tate a liability to a large amount.

And yet the administrators of the estate are here, by counsel, complaining of the exclusion of the memorandum as evidence, and asking a reversal of a decree which, to that extent, is manifestly in favor of their intestate.

But, waiving this consideration, let us see whether this paper is evidence. If it is, it must be because it is either the entry of a deceased person in the course of his official or other business, or because it is a declaration of a person against interest.

It is clearly not of the former class, being a mere recitation or acknowledgment, having no connection with the performance of any duty or exercise of any calling.

Upon the other hand, it is well settled that where the entry is offered upon the ground it is against the interest of the declarant, " it must be of a pecuniary or proprietary nature; the declaration in such cases derives its value exclusively from the fact that the person has made an entry or charge which it is against his interest to make, and the effect of which will be to render him pecuniarily liable to some third person." 1 Taylor on Evi. 670, 680; 2 Smith L. Cases, 338, 337; 1 Wharton on Evi. 238; 8th Leigh.

Now, in the present case Henderlite, in accepting the custody of the bonds in question, became a mere bailee without reward, and as such responsible only for gross negligence. The most that could be said is that if the bonds were lost or stolen through his negligence, and the amount by reason thereof was utterly lost to M. B. Tate, the latter might have some recourse against Henderlite. But all this is merely conjecture—contingent and improbable.

We think that such an entry does not come within the reason or the principle of the rule which admits declarations of a deceased person against interest, and that the circuit court properly so decided.

The next question is, whether the circuit court erred in not requiring Mr. James H. Gilmore to disclose certain conversations between himself and one of the appellants.

It is conceded that these conversations related to matters of professional confidence, and were therefore privileged;

Tate et al. v. Tatè'e Executor et als.

but it is insisted that the appellant has waived the privilege by testifying with respect to the conversation between Mr. Gilmore and himself.

The rule of law which protects professional conversation is for the benefit of the client, and there is no doubt he may waive it; but the waiver must be distinct and unequivocal.

It has been held that the client does not waive his privilege by calling his solicitor as a witness unless he also examines him as to the privileged matter. If, however, the client offers himself as a witness, he may be asked as to his communications to his counsel, if it be part of the case he undertakes to prove. 1 Wharton on Evidence, § 927, and notes. In the present instance, however, the client did not, upon his examination in chief, make any disclosure or statement with regard to any conversation between himself and Mr. Gilmore.

His testimony was brought out by the adverse counsel upon the cross-examination.

To allow one party to extract from his adversary a conversation between the latter and his attorney, and then to call the attorney to contradict the client, would result in the grossest injustice. It would create an antagonism between the attorney and client, and in effect destroy the rule which treats such communications as privileged. No man would ever feel safe in consulting a lawyer if such a doctrine was once established by the courts.

Upon the whole case, we are of opinion there is no error in the decree, and that the same should be affirmed.

DECREE AFFIRMED.